CUMBERLAND FARMS, INC.[1] *vs.* DREHMANN PAVING
& FLOORING CO.

No. 87-90.

Norfolk.  October 21, 1987. — March 29, 1988.

Present: PERRETTA, CUTTER, & SMITH, JJ.

*Uniform Commercial Code,* Warranty. *Sale,* Warranty. *Contract,* Performance and breach. *Negligence,* Installation of floor.

The warranty provisions contained in G. L. c. 106, §§ 2-314 and 2-315, had no application to a contract for the sale and installation of an acid-proof brick floor for a dairy processing room which began to deteriorate two and one-half years after its installation, where the floor was installed according to plans and specifications furnished by the buyer, where the seller did not possess any degree of discretion in the floor's installation, and where the buyer did not rely on the seller's expertise. [534-536]

Where the record in an action alleging breach of contract indicated that the buyer of an acid-proof brick floor for a dairy processing room provided the seller with plans and specifications for installation of the floor and specifically rejected the seller's suggestion that certain expansion joints be included at the high points of the floor that would have prevented the floor's subsequent premature deterioration, and where the evidence supported the judge's finding that the seller performed its obligation under the contract to install the floor in a good workmanlike manner, in accordance with the specifications, the judge correctly ruled that the seller did not violate the contract. [536]

The holding in *Zapatha* v. *Dairy Mart, Inc.,* 381 Mass. 284, 291 (1980), extending principles of good faith expressed in art. 2 of the Uniform Commercial Code to certain non-Code transactions, was not applicable in the circumstances of an action by a building owner arising from the failure of a brick floor which, after the defendant had advised modifications to the plans, it installed according to the owner's specifications. [536-537]

[1] The original complaint was brought by VSH Realty, Inc., a separate entity affiliated with Cumberland Farms, Inc. (Cumberland). Its function was to construct and develop properties for retail stores and dairy plants for Cumberland.

Effective October 1, 1984, VSH was merged into Cumberland, which assumed all VSH's assets and liabilities.

Throughout this opinion, VSH, and not Cumberland, is referred to as the plaintiff.

Where the judge, in an action alleging negligence in the defendant's failure to include certain expansion joints at the high points of a floor it installed for the plaintiff, found that the defendant's duties arose out of the terms of a contract between the parties which did not include a duty to install the expansion joints and that the defendant did its work in a good workmanlike manner, any harm suffered by the plaintiff due to the floor's premature deterioration was not caused by breach of any duty owed to it by the defendant and, accordingly, the plaintiff could not recover on a theory of negligence. [537]

CIVIL ACTION commenced in the Superior Court Department on November 1, 1979.

The case was heard by *Frederick T. Doyle*, J., sitting under statutory authority.

*Celia D. Moore* for the plaintiff.

*John Foskett* for the defendant.

SMITH, J. On November 1, 1979, V.S.H. Realty, Inc. (VSH), brought a complaint in the Superior Court against Drehmann Paving & Flooring Co. (Drehmann) as a result of certain problems that VSH had experienced with a brick and tile floor installed in a dairy plant by Drehmann. In its complaint, VSH charged that Drehmann had violated its implied warranty obligations under the Uniform Commercial Code by selling and installing an acid-proof brick floor for a dairy processing room which began to deteriorate two and one-half years after VSH installed it. The complaint also alleged that the failure of the floor constituted a breach of contract and that Drehmann was negligent in installing the floor. Drehmann denied all the allegations, and the matter was tried before a judge sitting without a jury. After the trial the judge found in favor of Drehmann, and judgment was entered accordingly. VSH has appealed from that judgment.

We summarize the judge's findings of fact, none of which are challenged by VSH. We supplement the findings with undisputed evidence that is not dependent on assessments of credibility. In January 1976, under the direction of Richard Longton, its vice-president in charge of construction, VSH drafted blueprints for a dairy plant in Florence, New Jersey.

VSH then became the general contractor for the construction of the plant.

In November 1976, Longton telephoned John Grelis, the executive vice-president of Drehmann. Longton informed Grelis that VSH was constructing a dairy plant in New Jersey that required an acid-proof floor. Drehmann had been engaged for many years in the business of manufacturing and installing brick flooring in food and dairy processing facilities. Drehmann held itself out as an expert in that field. Longton requested Grelis to visit the Florence site and submit a proposal. He informed Grelis that the flooring should be similar to the flooring previously installed by Drehmann in VSH's facility in Canton.

Grelis visited the construction site and spoke to one Joseph Tuch, VSH's on-site superintendent. Tuch showed Grelis plans of the proposed floor. The plans showed the thickness, the kind and size of bricks to be used, the type of grouting, and the location of expansion joints around the perimeter of the floor. No expansion joints were located at the high points of the floor. In addition, Grelis was specifically informed that the floor to be installed by Drehmann was to be similar to the floor it had installed in Canton.

On November 9, 1976, Grelis sent a written proposal to Tuch and quoted a price of $31,251 for the installation of 9,500 square feet of Drehmann Smooth Surface Brick in the dairy processing room.[2] The proposal included expansion joints around the perimeter of the floor but did not include expansion joints at the high points, or column lines, that would bisect

---

[2] The proposal stated:

"For the sum of THIRTY ONE THOUSAND TWO HUNDRED FIFTY ONE DOLLARS ($31,251.00), we will complete the work outlined.

"*The Work Included in this Proposal*

"1. Over the existing graded concrete slab, we will pave Drehmann 4" x 8" x 1¾₆" Smooth Face brick in a sand and cement bed of uniform thickness.

"2. Upon completion of paving, we will grout initially with liquid Portland cement in order to lock the brick to the setting bed.

"3. The top portion of the joints (approximately ½") is to be grouted with Drehmann Plastic Floor Grout (epoxy).

"4. We will install beveled turn up brick complete with premolded asphalt expansion joint, topped with elastic sealer at the walls."

the graded floor. The floor which Drehmann had installed in Canton for VSH did not have expansion joints at the high points. Longton accepted the proposal on condition that the price be reduced to $30,000, and Grelis accepted that modification. The accepted proposal constituted the only contract between the parties.

Before the floor was installed, Grelis recommended to Tuch that the floor should have expansion joints at the high points in addition to those around the perimeter. Tuch conveyed the recommendation to Longton, who rejected it. Grelis was not asked, nor did he explain, the ramifications, if any, if the additional expansion joints were not installed.

During the course of the installation of the floor, Tuch was replaced by one Butterfield as construction supervisor. Butterfield expressed his concern to Longton that expansion joints were not being installed at the high points and recommended their installation. Longton rejected Butterfield's recommendation. Butterfield observed Drehmann's work daily and, except for his concern about the lack of expansion joints, never complained to Longton that Drehmann was not performing its work properly. Drehmann completed the work in accordance with its agreement by the end of February, 1977.

Problems developed with the floor about two and one-half years after installation. Some of the bricks came up in pyramid fashion and fell loose at some of the high points on the floor. Cumberland continued to use the room, with the result that areas beneath the heaved bricks were exposed to hot water, corrosive lactic acids, and detergents. In 1979 Grelis, at Longton's request, inspected the floor. In a letter dated June 21, 1979, Grelis proposed to Longton that Drehmann would repair the floor by adding expansion joints at the high points and replacing the brick and setting bed for a width of sixteen feet on either side of the high points in both the length and width of the processing room. The cost of the repair would be $23,020. Longton consulted with experts and, in a letter dated July 17, 1979, called on Drehmann to repair the floor at its own expense. Drehmann refused to bear the expense.

In September, 1979, another contractor replaced 883 square feet of the existing brick and setting bed at a cost of about $10,000. The floor continued to deteriorate, and in 1982 a different concern repaired a section north of the portion repaired in September, 1979, at a cost of $9,700. In 1983, as the floor continued to deteriorate, Hudson Valley Tile did repair work at a cost of $55,744.84, plus additional sums for material. To date, 6,400 square feet of the original floor have been repaired.

The trial judge found that the cause of the damage to the floor was the lack of expansion joints at the high points and that, if expansion joints had been installed as Grelis had recommended, the damage to the floor would not have occurred. He also found that Drehmann performed the work it was required to do under the contract with VSH in a good workmanlike manner.

1. *Recovery under the Uniform Commercial Code.* VSH asserted that Drehmann was in breach of the warranties set forth in G. L. c. 106, § 2-314 (implied warranty of merchantability) and § 2-315 (implied warranty of fitness for a particular purpose) of the Uniform Commercial Code (Code). The judge, however, ruled that the Code did not apply in the circumstances. VSH claims that the judge's ruling was error.

Section 2 of the Code applies to "transactions in goods" (G. L. c. 106, § 2-102, inserted by St. 1957, c. 765, § 1). "Goods" are defined as "all things . . . which are movable at the time of identification to the contract for sale" (G. L. c. 106, § 2-105, inserted by St. 1957, c. 765, § 1). The rendition of services is not covered by the Code. *White* v. *Peabody Constr. Co.*, 386 Mass. 121, 132 (1982) (but see § 2-316A relating to consumer goods and services). Here, the contract involves both sale of goods (bricks) and rendition of services (installation of the bricks). In mixed contracts, such as this one, the test is whether the predominant factor, thrust, or purpose of the contract is (1) "the rendition of service, with goods incidentally involved, . . . or is [instead (2)] a transaction of sale, with labor incidentally involved . . . ." *Bonebrake* v. *Cox*, 499 F.2d 951, 960 (8th Cir. 1974). *White* v. *Peabody Constr. Co., supra.*

VSH contends that the predominant purpose of the transaction was the sale of the bricks and that the implied warranties found in the Code were violated. Drehmann claims that the predominant thrust of the contract was the rendering of services, not the sale of goods, and, therefore, the judge did not commit error in ruling that the Code did not apply to this transaction.

It is not necessary for us to determine which theory is correct because, on this record, even if we assume that the Code does apply, VSH still would not have a remedy under the implied warranties of merchantability and fitness for a particular purpose.

When goods are provided according to plans and specifications furnished by the buyer, the seller does not impliedly warrant their fitness for a particular purpose, and no implied warranty of merchantability arises. *Rust Engr. Co.* v. *Lawrence Pumps, Inc.*, 401 F. Supp. 328, 333 (D. Mass. 1975). *Blockhead, Inc.* v. *Plastic Forming Co.*, 402 F. Supp. 1017, 1026 (D. Conn. 1975). Also see G. L. c. 106, § 2-316, comment 9. ("The situation in which the buyer gives precise and complete specifications to the seller . . . is a frequent circumstance by which the implied warranties may be excluded."). Also see *School Supply Serv. Co.* v. *J. H. Keeney & Co.*, 410 F.2d 481, 483 (5th Cir. 1969).

Here, the record shows that Drehmann installed the floor based on specifications furnished by VSH. The contract indeed did not make any provision for expansion joints at the high points, but that was undoubtedly because VSH had excluded such joints from the plans and specifications on which Drehmann's proposal was based. Moreover, VSH rejected Drehmann's recommendation that expansion joints be installed at the high points. In these circumstances, Drehmann (the seller) did not possess any degree of discretion, and there was no reliance on its expertise by VSH (the buyer). Therefore, no implied warranty of fitness for a particular purpose arose. *Rust Engr. Co.* v. *Lawrence Pumps, Inc., supra. Blockhead, Inc.* v. *Plastic Forming Co., supra.* Furthermore, any conflict between an implied warranty of merchantability and an express warranty (the floor was to be similar to the one in Canton, which

did not have expansion joints at the high points) was displaced by an express warranty. G. L. c. 106, § 2-317 (*c*).

2. *Recovery for breach of contract.* The judge ruled that VSH could not recover against Drehmann for breach of contract because the agreement did not expressly call for the installation of expansion joints at the high points. VSH argues that the judge committed error, and it bases its argument, to a large extent, on the premise that its contract with Drehmann was an "end result" agreement, i.e., that VSH left it entirely up to Drehmann to provide a workable floor.

The record shows that VSH provided Drehmann with plans and specifications of the floor and rejected the recommendation that expansion joints should be installed at the high points (see part 1 of this opinion). As VSH dictated the specifications for the floor and rejected Drehmann's suggested modification that would have prevented the failure (the addition of expansion joints at the high points), Drehmann's obligation under the contract was to install the floor, in a good workmanlike manner, in accordance with the specifications. *Erickson* v. *George B. H. Macomber Co.*, 211 Mass. 311, 318 (1912). The judge found that Drehmann did perform its work in such a fashion, and the evidence supports that finding. Here, the absence of the expansion joints at the high points was the result of a decision by VSH. It did not include them in its plans and specifications and, on two separate occasions, refused to have them added to the contract. Where its own plans and specifications caused the damage of which VSH is now complaining, the judge was correct in ruling that Drehmann did not violate the contract.

VSH also argues that Drehmann violated the duty of good faith and fair dealing in drafting and performing the work under the contract. It argues that Grelis "knew" the floor could fail without expansion joints at the high points, yet did not inform VSH of that danger.

The record does not support VSH's argument. Grelis testified that, at the time he recommended expansion joints to Tuch, he did not think that failure to include such joints would cause the floor to fail, and that he thought there was only a "possibil-

ity" that lack of joints could be a "problem." The holding in *Zapatha* v. *Dairy Mart, Inc.*, 381 Mass. 284, 291 (1980), which, in certain situations, extends good faith principles expressed in the Code to non-Code transactions, is not applicable in these circumstances.

3. *Recovery for negligence.* VSH contends that if the Code is not applicable to the transaction, it should be able to recover from Drehmann on a negligence theory. It states that it should not be barred by the rule stated in *Marcil* v. *John Deere Industrial Equip. Co.*, 9 Mass. App. Ct. 625, 631 (1980), that "the purchaser of a manufactured product who claims as damages only economic loss or damage caused by the product to itself cannot maintain a claim for negligent design or manufacture."

We do not decide if VSH's claim for negligence is barred by the above rule because its claim is foreclosed on other grounds. "In order to maintain an action for an injury to . . . property by reason of negligence or want of due care, there must be shown to exist some obligation or duty towards the plaintiff, which the defendant has left undischarged or unfulfilled. This is the basis on which the cause of action rests." *Mounsey* v. *Ellard*, 363 Mass. 693, 695 (1973). Here, the judge found that "Drehmann's duties arose out of . . . the terms of the contract which did not include a duty to install expansion joints at the high points on the floor." The judge also found that Drehmann did its work in a good workmanlike manner. Thus, any harm suffered by VSH was not caused by breach of any duty owed to it by Drehmann, and VSH may not recover on a theory of negligence.

*Judgment affirmed.*